## LEGGETT *v.* THE BANK OF SING SING.

A provision in the articles of a banking association that the shares of its stock shall not be transferable until the shareholder shall discharge all debts *due* by him to the association, includes liabilities of the shareholder which have not matured.

Such a provision creates a valid lien as against an assignee of the stock, who takes with knowledge thereof, while the shareholder is under a contingent liability as indorser, and gives no notice to the bank of his claim until after the indorser's liability has become fixed.

THIS was an action upon the case for the refusal of the defendant to permit the transfer upon its books of twenty shares of the capital stock of the bank to the plaintiff as the assignee of one William E. Leggett. The cause was tried before a referee; and, upon the trial, it appeared that Leggett was one of the original associates in the organization of the bank, and became the holder and owner of twenty shares, of one hundred dollars each, of its capital stock. The articles of association required suitable books to be kept by the directors for the registry and transfer of the shares, and declared that "every transfer, to be valid, should be made on such books, and signed by the shareholder or his attorney duly authorized in writing." Section 3 of article 5 was in these words: "No share or shares shall be transferable on which any call for an installment of capital, or any interest on such installment, shall remain unpaid, nor unless the shareholder making the transfer shall previously discharge *all debts due by him* or her to said association, or shall have remaining capital stock untransferred sufficient to cover and secure the amount that he or *she may owe* to the said association." Section 4 of the same article made provision for the sale of the stock "whenever any shareholder of the association should owe *a debt then due* to the association, and which should have been

due and unpaid for the space of three months." These provisions were, as the referee found, well known to the plaintiff.

On the 3d day of January, 1854, William E. Leggett sold and assigned his stock to the plaintiff, and delivered the certificate, assignment and power of attorney to transfer the same on the books of the bank to said plaintiff. On the 8th day of May, 1855, and again on the 10th and 14th days of the same month, the plaintiff demanded of the defendant, upon a production of the assignment and power of attorney and offer to surrender the original certificate of stock, that the stock be formally transferred on the books, and a new certificate thereof be delivered to the plaintiff; which was refused by the defendant, claiming that the original shareholder was a debtor to the bank, and that the stock was a security for the payment of such debt, and was not transferable until the same should be paid. It was admitted that William E. Leggett, on or about the 1st day of January, 1854, was indorser on notes of one Thompson, since deceased, to the amount of four thousand dollars, which notes were then held by the defendant; that Thompson died before said notes became due, and the notes were protested and the indorser charged; that W. E. Leggett became the executor of Thompson, and from time to time paid portions of said notes, and gave his notes as executor, indorsed by him individually, for the balance due. It also appeared that, on the 9th of April, 1855, there remained due of the Thompson debt one thousand nine hundred dollars, for which W. E. Leggett, on that day, made a note, payable on the first day of August thereafter, payable to his own order, and indorsed by him, and signed, "W. E. Leggett, Ex.," which note was outstanding and held by the defendant at the time of the demand of the transfer and new certificate in May, 1855. The referee decided that the note for one thousand nine hundred dollars not having matured at the time of the demand for a transfer of the stock, the same was not a lien upon the capital stock of the maker, and that the plaintiff was entitled to a transfer of the stock, notwithstanding such indebtedness; and gave judgment for the plaintiff for the value of the stock,

which was affirmed by the Supreme Court sitting in the first district; and from that judgment the defendant appealed to this court.

*John K. Porter*, for the appellant.

*David Dudley Field*, for the respondent.

WRIGHT, J. The real inquiry is, was there a "debt due" from Leggett to the bank, within the meaning of the articles of association, at the time the transfer of the stock was demanded. It is not the question, whether, at the time the plaintiff became the equitable owner of the stock, by a secret, undisclosed sale, the shareholder was such debtor; nor whether the indorser of a promissory note, whose liability has not been fixed, falls within the class of debtors in respect to whom the lien was intended to attach. It may be conceded that it must be a fixed liability of the shareholder himself. The referee finds, and the case discloses the facts, that, in January, 1854, Leggett was the indorser on certain notes made by one Thompson and discounted by the bank, which had not then matured. Thompson died before the notes matured, and after their maturity Leggett reduced the amount of such notes by payments. On the 9th April, 1855, there was the sum of one thousand nine hundred dollars remaining due, for which amount Leggett made a note, payable at the defendant's bank on the 1st August, 1855, to his own order, and indorsed by himself. The note was signed "W. E. Leggett, Ex." Leggett thus undoubtedly became a debtor to the bank. If his contingent liability as indorser had not been fixed previously, he undertook then to become personally responsible for one thousand nine hundred dollars of the indebtedness. Affixing the letters "Ex." to his signature could not alter his personal liability or bind the estate of Thompson. This was the view taken by the referee and the Supreme Court. If Leggett was not a debtor of the bank, within the meaning of the articles of association, prior to the 9th April, 1855, he unquestionably assumed the relation at that time.

But the referee placed his decision, not on the ground that Leggett was not indebted to the bank when the transfer of the stock was refused, but on what I deem to be an erroneous construction of the provision of the articles of association touching the question. The phrase, "all debts due by him or her to the association," was held to mean only debts presently payable, and that, although a stockholder may have borrowed on his own note the money of the bank and put it in his pocket, unless such note had matured, no lien attached, and the association could not lawfully refuse a transfer of his stock. This cannot be a correct interpretation of the sense in which the associates used the words, "all debts due," or designed that they should be understood. The provision was intended to embrace all debts which the stockholder owed the association, whether payable presently or in the future. Its purpose was, not to facilitate stockjobbing, but to promote the legitimate business of banking, and to benefit the bank by strengthening its securities; and it is in this light that the provision is to be construed. There is a much stronger reason for inferring an intention to embrace debts payable in the future rather than presently, growing out of the fact that most of the debts created with a banking institution are through the medium of discounted paper, where the credit of the borrower is extended. As was said in *Grant* v. *The Mechanics' Bank of Philadelphia* (11 Serg. & Rawle, 143), of what benefit would it be if the stockholder had the unrestrained right of transfer at any time before his note fell due? The time of making the loan is that at which the directors must look for security. To construe the provision to embrace only debts presently payable, would be to limit it for the benefit of the borrower, and not the association. The whole provision, taken together, shows that the object of making the stock not transferable was to "cover and secure" the amount owing by the stockholder to the association, whether due and payable *in presenti* or *in futuro*. The restraint is upon transferring the stock, "unless the shareholder shall previously discharge all debts due by him to said association, or shall have remaining capital stock untransferred suffi-

cient to cover and secure the amount that he may owe to said association." The expression, "the amount that he may owe," is evidently intended as the equivalent of the previous phrase, "debts due;" each being used to denote the indebtedness which the stock was to "cover and secure." The apt and explicit words used by the associates in the succeeding section of the fifth article, to limit the right of sale to cases of actual default, shows that they had no difficulty of discriminating, when that was their purpose, and excludes the idea that the general words of the previous section were used in the same restricted sense.

When, therefore, the bank was first notified that the stock had been assigned to the plaintiff, and the latter demanded that it should be transferred to him, Leggett, the shareholder, was a debtor to the bank, and on that ground, I think, such transfer was rightly refused. It can make no difference with the question if it should be conceded that, in January, 1854, when the plaintiff became the equitable owner of the stock, Leggett was not a debtor to the bank, and that then, had a transfer been demanded, it could not have been legally refused. Nor is it important to determine what would have been the rights of the plaintiff and the bank, had the plaintiff, upon becoming the equitable owner of the stock, notified the bank that he was such owner. Nothing of the kind was done. The case is presented of the plaintiff, unknown to the bank, in January, 1854, purchasing a shareholder's stock, and taking an assignment of a certificate expressing on its face that the shareholder's title was, subject to all conditions and stipulations in the defendant's articles of association, transferable only on the books of their banking-house, by him or his attorney, on delivery of such certificate; and that, although knowing that the articles of association gave the bank a lien on such stock for any debts due from the shareholder at the time the transfer was demanded, neither notifying the bank that he was such owner, or demanding a transfer, until sixteen months after the alleged secret purchase, and after the shareholder, if not a debtor to the bank at the time of sale, had subsequently become such debtor.

The lien unquestionably attaches in respect to the shareholder's debts existing when the bank is asked to transfer the legal title; and one becoming the owner of stock, subject to a provision in the articles of association giving the bank such lien, and of which he has knowledge, but who omits to give the bank notice of his ownership, and thereby enables his vendor to have credit on the faith of his being a stockholder, has no superior equity to be enforced.

The judgment of the Supreme Court should be reversed, and a new trial ordered, with costs to abide the event.

DENIO, DAVIES, GOULD and SMITH, Js., concurred.

*ALLEN, J.* (dissenting.)   The corporate powers of the defendant are derived wholly from the general banking law under which it became incorporated.   It can exercise no power except such as is authorized by that act, which is the organic law of every corporation created under its authority. But the dealings of the associates with each other, and the rights of shareholders over their stock, are not among the corporate powers of the institutions organized under the law, and are not to any great extent regulated by it.   The declaration that the shares of the association shall be deemed personal property and transferable on the books of the association in such manner as may be agreed on in the articles of association (Laws of 1838, ch. 260, § 19), has respect only to the *modus operandi* of the transfer and not to the right of transfer or to any restrictions upon such right.   There is no authority in the law for any restraint upon the power of alienating the capital stock of the association formed under it; and the provision in the defendant's articles of association imposing conditions upon the rights of shareholders to transfer their stock, does not rest for its vitality upon any law of the State or by-law of the association.   It rests only upon the agreement of the shareholders.   The original subscribers, of whom Wm. E. Leggett was one, by signing the articles became parties to the agreement, and every subsequent purchaser of the capital

stock by accepting a transfer of the original scrip or new certificates for the shares bought, assented to the terms and conditions upon and subject to which the stock was held by the shareholders as declared by the certificates to it, as "subject to all conditions and stipulations in their articles of association." As an agreement in effect making the debt of the shareholder a lien upon his stock, it is not prohibited by any law and is inconsistent neither with any statute nor with public policy. A pledge of the stock in security for the payment of a debt actually contracted would clearly be valid, and an agreement pledging it, given in advance of the debt, can be nevertheless valid. Similar provisions in special charters granted by the legislature are not unusual, which is high evidence that public policy sanctions them; and courts have sustained and enforced such provisions. (*Union Bank of Georgetown* v. *Laird*, 2 Wheat., 390; *Bank of Utica* v. *Smally*, 2 Cow., 770.) Each association organized under the general banking law may incorporate such special powers in its articles of association not inconsistent with the laws of the State as the associates shall think expedient, and these special provisions will have the force of law with the associates. The articles of association, the voluntary agreement of the associates in regulating the terms of their association and their rights as members thereof, takes the place of a special charter and performs its office.

I am constrained, however, to differ with the court below in the construction of the provisions upon which the defence rests. The learned justice, pronouncing the judgment of the Supreme Court, was of the opinion that it only related to debts actually due, and that a shareholder or debtor of the bank, if his indebtedness had not matured, might transfer his stock and the bank had no lien thereon. So far as material to this case the provision is that "no share or shares shall be transferable unless the shareholder making the transfer shall previously discharge all debts due by him or her to said association." The very restricted interpretation of the court below practically nullifies the provision. If the debtor or shareholder can, the day or the hour before his debt to the bank becomes

due, transfer his stock and deprive the bank of its contemplated lien under this clause of its articles of association, the whole intent and design of the provision would be valueless. The words employed do not call for such interpretation. A reasonable construction of the term "debts due," and that which in ordinary usage would be given it, would carry out the intent of the associates and include within the benefits of this section all debts actually contracted and existing, whether due or yet to become due. Neither is there any such technical and restricted meaning given to the words by lexicographers or jurists as to confine them to debts actually due and payable. The legal acceptation of "debt" is a sum of money due by certain or express agreement (3 Bl. Com., 154). A debt in ordinary parlance means any claim for money, and a debt is properly said to be due, in the sense of *owing*, when it has been contracted and the liability of the debtor is fixed. (Burr. L. Dict.; Bouv. L. Dict.) Debt and due are both derived from the same verb; the former is a substantive, and in this instance the latter is used as an adjective. Debt also means that which is due from one person to another, and the word due does not necessarily vary the meaning; as that means, in one sense, simply owed. It may, when used with that intent, mean a debt actually payable, the time for the payment of which has arrived. The context and the circumstances under which it is used must determine in what sense it is used. Due, when used as a noun, is synonymous with debt.

"Due," applied to "debts," preferred by an act of Congress, is equivalent to "owed" or "owing," and includes all debts although payable in future. (*United States v. The State Bank of North Carolina,* 6 Pet., 29.) The obvious meaning of the clause in the defendant's charter is, that the shareholder shall discharge all debts owing by him before he shall transfer his stock. Was, then, W. E. Leggett, on the 3d day of January, 1854, the day on which the plaintiff claims to have acquired title to his stock, a debtor to the defendant? He was at that time an indorser on notes held by the defendant made by one Thompson which had not then matured; that is, he was con-

tingently liable to the bank for the debt of Thompson, and his liability could only become absolute when he should be charged as indorser. His engagement was conditional, dependent upon the default of the maker in the payment of the note upon due demand and reasonable notice of such default to himself. He became a debtor when his liability became fixed and certain and not before. The sum of money mentioned in the notes thus became a " *debt due by him.*" A contingent liability is no more a debt existing against or owing by an individual when the liability is created by becoming a party to commercial paper, than when it is incurred in any other form. A surety in an undertaking given upon an appeal or on an appeal bond, is from the moment he signs the instrument and it is used for the purpose intended, contingently liable for the debt and default of his principal; but in neither case would he be the debtor of the appellee or of the State, and yet his liability cannot in principle be distinguished from that of an indorser of a promissory note. The difference is only modal, and relates to the conditions upon which the liability may become absolute.

In ordinary parlance, as well as in statutes, and in ordinary legal acceptation, a distinction is recognized between a debt, although not actually payable, *debitum in presenti solvendum in futuro*, and a contingent liability which may ripen into an absolute liability and become a debt in the ordinary sense of that term. *In re Drury* (2 Hill, 220), a debt signifies whatever any one owes, and he does not owe that for which he is only conditionally or provisionally liable. (*People* v. *Morrill*, 3 Seld., 124.) The obligation of a contract does not become a debt, within the sense of the prohibitions of a city charter forbidding the common council from authorizing an expenditure within the current year exceeding the amount of the annual tax levy, until money becomes payable according to its terms. (*Weston* v. *The City of Syracuse*, 17 N. Y., 110.) Under the general act for the incorporation of manufacturing corporations (ch. 40 of 1848), stockholders are liable for debts incurred by the corporation before the stock is fully paid; and

trustees are made individually liable for a debt of the corpo-
ration contracted during a default in filing and publishing the
annual report required by law. In construing and giving
effect to that law, this court has held that under a contract be-
tween an individual and the corporation, that the former should
deliver and the latter receive and pay for personal property
at a future day, a debt does not arise until the delivery of
the property; that is, the contingent liability becomes a debt
only when the obligation to pay becomes absolute by the per-
formance of the conditions or the happening of the contingency
upon which this obligation to pay depends. (*Garrison* v. *Howe*,
17 N. Y., 458.) The principle now asserted is not affected by
the cases holding that for certain equitable purposes and for
the prevention of a fraud, a party contingently liable upon a
contract may be deemed a debtor—as in *Elwood* v. *Diefendorf*
(5 Barb., 398)—for the purpose of enforcing against a devisee
a debt which a testator was equitably bound to pay, and who
had charged his debts upon lands devised, and in *Van Dyck* v.
*Seward* (18 Wend., 375), and other similar cases, holding that
a contingent liability was within the meaning of the statute,
avoiding all gifts, &c., made to hinder and delay creditors.
The same equitable extension of the statute has been made to
protect demands and claims for torts, which are in no just
sense debts. (*Jackson* v. *Myers*, 18 John., 424; *Fox* v. *Hills*,
1 Conn., 295.) Giving the provision all the effect which can
be claimed for it under a literal construction, and it cannot
make him a debtor to the bank so as to charge his stock and
prevent its transfer, who is only contingently liable for the
contract and engagement of a third person. W. E. Leggett
was not then a debtor to the bank on the 3d of January, 1854,
and had the free disposal of his stock.

He did on that day, for a valuable consideration, sell his
stock to the plaintiff, assigning and delivering to him the evi-
dences of his title, the original scrip or certificate issued by
the defendant, executing and delivering at the same time a for-
mal power of attorney to transfer the stock upon the books of
the bank. Notwithstanding the declaration in the defendant's

articles of association, that "every transfer [of stock] to be valid shall be made on the transfer books," this assignment was valid as between the parties to it, and vested in the plaintiff the equitable title to the stock, and the right to be substituted upon the books of the bank as the legal holder of it. Had the plaintiff on the same day of the assignment demanded the formal transfer upon the books of the bank, he would have demanded but his legal rights, and an action would have lain for the refusal. Whether equity would have compelled the specific performance of the duty of the bank to permit the transfer, or the courts would have interfered by mandamus, it is not necessary to inquire. It is sufficient that the transaction gave to the plaintiff the equitable title to the stock, and recognized a legal right to the formal legal title, and the usual evidences of such title. The rights of parties standing in the situation of the plaintiff, are too well settled to be the subject of discussion in the courts of this State. The assignor and holder of the scrip is the owner of the stock as against the assignee, and as against all persons not having a prior equity, and the legal title is only not transferred as respects the bank, and for its protection. The bank, until a transfer of the stock in the mode prescribed by its charter, may recognize the vendor as still the real owner, and may pay to him the dividends and give him in the conduct of the affairs of the bank, all the rights of a stockholder. The sole object and purpose of the requirement of this formal transfer, is the convenience of the bank to this extent. The provision does not interfere with the rights of ownership as between the original stockholder and his vendee or pledgee. Such is undisputably the law in this state, as settled by the decisions of all the courts. (*Bates* v. *New York Insurance Company*, 3 J. R., 238; *Bank of Utica* v. *Smally*, 2 Cow., 770; *Stebbins* v. *Phœnix Fire Insurance Company*, 3 Paige, 250; *Commercial Bank of Buffalo* v. *Kortright*, 22 Wend., 348, affirming same case, 20 id., 93.) It is true that the decisions in the courts of other states are contrary to the rule adopted, and so well settled in this State; and the judges expressly disregard the principle settled by the

court for the correction of errors in Kortright's case, and which we regard as law. See per Chief Justice SHAW, *Fisher* v. *Essex Bank*, 5 Gray, 383. He cites the Massachusetts, Connecticut and Vermont cases, as directly in conflict with the cases in our own courts. So long as our own decisions are to be regarded, we must follow out and apply those principles and results, and cannot engraft upon our rules the principles and results of decisions not in harmony with them. The New England courts have made the transfer of stock in corporations, whose charters require a transfer upon the stock book, an exception to the general rule regulating the transfer of property, and have given the clause in the charter a stringent and far-reaching effect, which is denied to it in our courts. Those cases deny all equities to the purchasers of stock, whose title does not appear upon the books of the bank, as against all persons who have no notice of the change of title, treating the stock book as the only legitimate evidence of title, and ignoring the scrip as of any value; and hence even creditors may attach stock standing in the name of their debtor, although it has been actually sold and the scrip transferred to a *bona fide* purchaser. (*Fisher* v. *Essex Bank, supra; Salem* v. *Bank of Woodstock*, 21 Verm., 362; *Oxford Turnpike* v. *Bunnel*, 6 Conn., 558.) We cannot adopt the principle of these cases without directly overruling all the cases in our own courts. In this State, the formal transfer upon the books of the bank, is regarded as not affecting the transaction between the parties, but as required for the convenience of the corporation and its protection; and if any other effect is to be given to it, it is in reference to the personal liability of stockholders to creditors, and as charging those who appear on the books as stockholders. But as between the parties to the sale and third persons, the same effect is given to a conveyance of the stock outside of the books, as is given by law to assignments of choses in action, or rights not negotiable or assignable. The transferree is regarded as the equitable owner, and the transferrer as his trustee; and the rights of the transferree are perfect at law and in equity, as against all persons, except those who

have some prior equity. In *Bates* v. *New York Insurance Company, supra,* the rights of the purchaser of the stock were protected against the corporation dealing with the original stockholder after notice of the sale, although the change of title before the payment of all the installments was prohibited. A purchaser without the prescribed formal transfer, takes the stock subject to any equitable claim which exists against it at the time in favor of the company, or any other person, and this is the express holding in the cases cited from the courts of our own State. Chancellor WALWORTH, in *Commercial Bank* v. *Kortright, supra,* says: " An agreement to transfer certain specified shares founded upon a good consideration, actually paid therefor, or an actual hypothecation thereof for the payment of a specified debt, but not intimated on the books of the company, although it does not transfer the legal title to the stock, is a good equitable transfer or hypothecation thereof, which will give to such assignee a preferable claim over any person who has not a prior equity, unless he has obtained a legal title to the stock by an actual assignment upon the books of the corporation, without notice of such equity. This is the maxim: that when the equities of the parties are equal, and neither has the legal title, he who is first in time is strongest in right. *Qui prior est in tempore potior est in jure.*

On the third day of January, 1854, the plaintiff became the equitable owner of this stock, absolutely entitled to it as against the original stockholder and the defendant, as the latter had no lien upon it or equitable title to it, and the legal title was not then, and has not since been, and is not now in the defendant. On that day he had a right to demand of the defendant, a transfer of the stock, and the defendant could not have refused. The demand was delayed until May, 1855, but had the plaintiff lost his title, or had the defendant acquired any title or any superior equity to that of the plaintiff? The legal title remained where it did in January, 1854, in the original stockholder, who was but the trustee for the party equitably entitled; the plaintiff's equities were without change, and the defendant at most had but an equity, and as between the two

as the plaintiff's equity occurred before the defendant had any equity, it was necessarily prior in time, and therefore paramount to that of the defendant. Equities prevail in the order of time in which they occur. Broome's Leg. Max., 329. It is not necessary to say that had the defendant, after the sale of the stock to the plaintiff, dealt with the original stockholder upon the faith of the stock still remaining in his name on its books, and without notice of the transfer, it would not have been protected: there was no such dealing. The contract, which at the time of the transfer, was not a debt and raised no equity on behalf of the defendant without a new consideration, or the parting with any value by the defendant, became a debt against the original stockholder, and thus would have created an equitable lien upon the stock, had the title not been changed; but as an equitable title it was junior in time to that of the plaintiff, and it was attended by no circumstances which should entitle it to prevail against the plaintiff. The equitable lien attached only from the time of the existence of the debt, and could not by relation operate and take effect as of the time of the making of the contract out of which it arose, so as to overreach the title of the plaintiff. There is perhaps some confusion growing out of the consideration of the two sections of the charter — the one regulating the mode of transfer, and the other defining the rights of the shareholders — together. The first (§ 2 of Art. 5) prescribes the mode of transfer solely to protect the bank in its recognition of the parties as stockholders, whose names appear as such. The other (§ 3 of same Art.) alone makes provisions for the pledge of the stock, for the debts of the shareholder, and in it no reference is made to any particular mode or form of transfer, but the prohibition is of any transfer that the law recognizes until the debts of the shareholder are paid. It prohibits alike the transfer which was made on the 3d of January, 1854, and which the law says was effectual to pass the title to the stock, and the mode of transfer prescribed for the security of the bank. Section three should be construed as if section two did not exist, and the transfer to the plaintiff was effectual from

the time it was made, as against the defendant, and any equity it could thereafter acquire.

If the defendant has any lien, it arose upon and by reason of the protest of the Thompson note, and then the debtor W. E. Leggett was not a shareholder, and had no stock to pledge, or which was within the operation of the agreement in the articles of association. The agreement was only operative against shareholders, and it cannot be claimed that if W. E. Leggett had on the day of the Thompson note matured, executed a formal pledge of the stock to the bank, in security for its payment, any title would have vested on the defendant, and to me it seems very plain that an executory agreement in advance, that such pledge shall arise and exist from a given time, cannot give the party any better title. The clause in the charter gives no equity and creates no lien: it is the debt that creates the lien, and how that is to attach to a title that does not exist, that has passed away from the debtor, is difficult to be understood. At the most, it is but an executory agreement, that any stock he may own when he should become a debtor to the bank, should be bound for the payment of the debt. But when W. E. Leggett became a debtor, he was not a shareholder legally or equitably, and the agreement did not run with the stock, and bind it in the hands of a purchaser for a debt created or arising after the transfer. It should be borne in mind that there is no element of fraud which might overcome the equities of the plaintiff in the case: all is fair and both parties are *bona fide* claimants. The defendant is not entitled to succeed by reason of the weakness of the title of the plaintiff, for that was perfect on the 3d day of January, 1854, and has not been impaired since; and it cannot succeed on the strength of its own title, because it has no better title than the plaintiff, that is, it has not secured the legal title and its equities as junior in time must yield to those of the plaintiff, or which is the better and more correct expression, the defendant acquired no equities for want of any title in W. E. Leggett its debtor, upon which equities could attach. The appellant should show at what time, and by what means the plaintiff lost his title,

which was indisputably good when he acquired it, and which he had done nothing to forfeit. A shadowy and vague equity resting upon several circumstances, neither of which alone, nor all together, constitute any tangible title, legal or equitable, ought not to prevail over a recognized and well-established legal right.

· The judgment should be affirmed.

SELDEN, Ch. J., and SUTHERLAND, J., also dissented.

Judgment reversed and new-trial ordered.